**Carl A. RICHARD, Appellant–Petitioner,**

v.

**Carmen L. RICHARD.**

**In the Matter of the Paternity of C.R.R., a child born out of Wedlock by Next Friend Carmen L. Richard.**

**Carl A. Richard, Appellant–Respondent,**

v.

**Carmen L. Richard, Appellee–Petitioner,**

v.

**Carl A. Richard, Appellant–Third Party Petitioner,**

v.

**Charles A. Richard, Third Party Defendant.**

No. 25A05–0402–CV–82.

Court of Appeals of Indiana.

July 27, 2004.

Jay T. Hirschauer, Hirschauer & Hirschauer, Logansport, IN, Attorney for Appellant.

John R. Hillis, Hillis & Hillis, Logansport, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Petitioner, Carl A. Richard (Carl), appeals the trial court's determination that he is the biological father of a daughter, C.R.R.

We affirm.

### ISSUES

Carl raises two issues on appeal, which we restate as follows:

1. Whether the trial court violated Indiana Rule of Evidence 201 when it took judicial notice of facts not adduced at the hearing when entering its judgment; and

2. Whether the trial court erred in determining that Carl is the biological father of C.R.R.

### FACTS AND PROCEDURAL HISTORY

Carl and Carmen Richard (Carmen) married on August 13, 1994. Two daughters were born during the course of their marriage. On September 1, 1999, Richard filed his Petition for Dissolution of Marriage in the Fulton Circuit Court. On September 15, 2000, the trial court conducted a final dissolution hearing in this matter. At the hearing, Carmen testified that she was not pregnant. Following the hearing, the trial court issued its Decree of Dissolution, whereby the marriage of Carl and Carmen was dissolved.

Thereafter, on June 1, 2001, Carmen gave birth to a baby girl, C.R.R. On May 14, 2002, Carmen filed her Petition to Establish Paternity and Affidavit of Birth in which she named Carl as the respondent. However, on July 14, 2003, Carl filed his Third Party Complaint to Establish Paternity in which he named his identical twin brother, Charles Richard (Charles) as the third-party respondent. In his petition, Carl requested that the trial court enter an order determining Charles to be the biological father of C.R.R. and dismissing Carmen's Petition to Establish Paternity filed against Carl. Subsequently, Carl and Charles each submitted to DNA testing to determine if either of them was the biological father of C.R.R. Carl's test results indicated that his probability of paternity was 99.999% "as compared to an untested, unrelated random person of the Caucasian population." (Appellant's App. p. 75). Charles' test results indicated that his probability of paternity was 99.995% "as compared to an untested, unrelated random person of the Caucasian population." (Appellant's App. p. 76).

On October 30, 2003, the trial court conducted a hearing on the parties' petitions. On November 3, 2003, the trial court issued its Order finding Carl to be the biological father of C.R.R.

Carl now appeals. Additional facts will be supplied as necessary.

### DISCUSSION AND DECISION

#### I. Judicial Notice

■ Carl first argues that the trial court violated Indiana Rule of Evidence 201 when it took judicial notice of facts that were not adduced at the hearing and then relied upon those facts in entering its judgment. However, Carl's argument is unavailing in that he fails to support his argument with specific references to the record or to materials in the appendix as required by Indiana Rules of Appellate Procedure. As a result, we find this argument waived. See Ind.App. R. 46(A)(8)(a).

■ Waiver notwithstanding, we find that any error the trial court committed in taking judicial notice of facts not in evidence is harmless error. In its Order, the

trial court volunteered the following information:

> The [c]ourt is aware of substantial family history concerning the Richard's family, counsel being aware of the [c]ourt's knowledge but failing to make a substantial record upon these topics at hearing. The Richard clan is a [close-knit] family in a manner unusual in today's society. The Richard's family runs a dairy farm under the name of the Richard's Family Farm, Inc. Carl is a shareholder in the farm and Charles is an employee but not a shareholder there. Approximately 15 years ago, Charles was involved in an accident which left him in a coma for three weeks. He emerged from the coma somewhat changed and more prone to violence, and has since been involved in some events of battery. The [c]ourt believes it fair to say that after the coma his higher reasoning abilities became marginally impaired so that he is somewhat less restrained in his statements and, occasionally in his behaviors than he was before. His crude statements in testimony here are typical of his behaviors since that time. Also flowing through this entire transaction are monetary issues which the parties did not argue but which are visible to the [c]ourt and which provides ulterior motives to each of the parties' testimonies. Carl is a person of means and may even be considered wealthy. Charles lives at the edge of poverty, perhaps subsistence being a more descriptive word, probably being maintained by other family members, but claiming incomes of no more than $100 per week as he attempts to meet previously determined child support arrearages for children born before his accident. The day preceding [the] hearing, he provided to the [c]ourt a paycheck stub confirming his income status. In claiming paternity, he requested, by his testimony at the hearing, that he be ordered to pay $25 per week in support. Carmen, of course, is aware of all of this.

(Appellant's App. pp. 17–8).

■ Carl asserts that the trial court's recitation of the above information violates Ind. Rule of Evid. 201 which allows a trial court to take judicial notice of a fact or law. A trial court may take judicial notice of records of a case over which it presides; however, the trial court may not take notice of records of another case, even if it involves the same parties with nearly identical issues. *In re Paternity of Tompkins,* 542 N.E.2d 1009, 1014 (Ind.Ct.App.1989). Nevertheless, while it was improper of the trial court in the instant case to volunteer the information set forth above in its Order, we fail to see how Carl was prejudiced by the error. *See Matter of A.C.B.,* 598 N.E.2d 570, 573 (Ind.Ct.App.1992)("[e]rror must result in prejudice in order to disturb the judgment"). Our review of the record yields no indication that the trial court based any of its decision on the information set forth in the Order but not adduced at the hearing. In fact, it is clear from the remainder of the trial court's Order that the trial court based its decision on the fact Carl simply failed to present sufficient evidence to overcome the presumption of paternity arising from the marriage pursuant to Ind.Code § 31–14–7–1. As discussed below, we agree with the trial court's conclusion in this matter; therefore, we find that any error committed with respect to the trial court's spontaneous judicial notice of facts is harmless. *See A.C.B.,* 598 N.E.2d at 573; *see also Tompkins,* 542 N.E.2d at 1014.

## II. *Presumption of Paternity*

■ Carl also challenges the trial court's conclusion that he did not successfully rebut the statutory presumption that

he is the biological father of C.R.R. In particular, Carl argues that the presumption was successfully rebutted when Charles acknowledged paternity and offered to pay $25 per week in child support. We disagree.

■ Indiana Code section 31–14–7–1 provides in relevant portion:

A man is presumed to be a child's biological father if:

(1) the:

(A) man and the child's biological mother are or have been married to each other; and

(B) child is born during the marriage or not later than three hundred (300) days after the marriage is terminated by death, annulment, or dissolution;

\* \* \*

(3) the man undergoes a genetic test that indicates that at least a ninety-nine percent (99%) probability that the man is the child's biological father.

In the case at bar, Carl and Carmen's divorce was finalized on September 15, 2000, and C.R.R. was born on June 1, 2001—well within the 300 day period set forth in I.C. § 31–14–7–1(1)(B). In addition, DNA testing indicated that there is a 99.999% probability that Carl fathered C.R.R. Nevertheless, the presumption may be rebutted by direct, clear, and convincing evidence that the husband: (1) is impotent; (2) was absent so as to have no access to the mother; (3) was absent during the entire time the child must have been conceived; (4) was present with the mother only in circumstances which clearly prove there was no sexual intercourse; (5) was sterile during the time the child must have been conceived; or (6) can show that the DNA test of another man indicates a 99% probability that the man is the child's

father combined with uncontradicted evidence that the man had sexual intercourse with the mother at the time the child must have been conceived. *Minton v. Weaver,* 697 N.E.2d 1259, 1260 (Ind.Ct.App.1998), *trans. denied.* However, the record reveals no such evidence here.

To the contrary, Carl's testimony shows that, although he adamantly denies having sex with Carmen, he had access to her during the period of time that C.R.R. would have been conceived. Likewise, he presented no evidence that he was impotent or sterile. Our supreme court has previously held: "[f]or the putative father to merely state that he did not have relations with his wife when he had opportunity to, regardless of the quality or credibility of his testimony, is not sufficient to set aside the presumption." *L.F.R. v. R.A.R.,* 269 Ind. 97, 99, 378 N.E.2d 855, 857 (Ind. 1978).

Nevertheless, unlike most paternity cases, this case involves two men whose DNA testing indicates a 99% probability of paternity, because Carl and Charles are identical twins. Carl contends that the presumption of his paternity was successfully rebutted when his twin brother, Charles, acknowledged paternity and offered to pay $25 per week in child support.

However, we have reviewed the transcript of the hearing on Carmen's Petition to Establish Paternity. To say that Charles "acknowledged" paternity of C.R.R. and offered to pay child support for her lends a certain, almost chivalrous, credibility to Charles' gesture that simply is not present in his actual testimony. The sum and substance of his testimony, which consisted only of direct examination, unfolded as follows:

Q. Okay, have a seat and tell us what your name is please.

A. Charles Arthur Richard.

Q. And, Charles, [ ] you're the brother of Carl, is that right?

A. Twin brother.

Q. You go by Charlie? People call ya? Is that right?

A. Yeah. You call me Chuck and I'll slap ya.

Q. Okay. Charles is that what you want to be called, is that right? Charlie?

A. Yeah, Charlie.

Q. Okay. Now, Charlie, [ ] do you know Carmen? Carmen Richard, do you know her?

A. How many times do you think I bred her?

Q. How many times what?

A. Do you think I bred her?

Q. Okay how many times did you bred (sic) her?

A. Ask her.

Q. No, I'm asking you.

A. About ten (10).

Q. And where did you have sex with her?

A. Well, I was out in the feed room and she came out and put it in her mouth and then I bent her over and stuck it in her.

Q. Now, when did that happen?

A. About ten (10) times or so.

Q. Not . . . not . . .

A. But I . . . I don't know the precise date.

Q. Okay. How . . .

A. It could have been about nine (9) months before she had that [C.R.R.] kid.

Q. All right. You said before you left there you said something about you wanted her to tell you . . . tell us about Kentucky. What do you know about her going to Kentucky? Do you know she went to Kentucky?

A. Yeah.

Q. Took off and left . . . is that right?

A. Yeah.

Q. And how did your brother [ ] . . .

A. She went to Kentucky and left the kids.

Q. Right. Left the kids with your brother.

A. And . . . and . . . and then came back and bred me again after she got back from Kentucky. And after she got back from Kentucky she was pregnant. She got pregnant.

Q. And now was she pregnant with [ ] . . . from somebody in Kentucky or somebody with you or your brother?

A. I guess it had to be me.

Q. I have no further questions.

A. Because he didn't . . . because he had to take [care] of the kids and everything and he didn't want no part of her.

Q. Right. He was mad at her wasn't he?

A. Yeah. He was mad at her, he didn't want no part of her and she came down there and she had to have sexual intercourse from somewhere and she thought I'd do it.

\* \* \* \*

[CHARLES]: For the record, I could afford to pay twenty-five (25) dollars a week. I already pay twenty-five (25) for my ex. My first wife that works in the system. I could . . .

[MR. HIRSCHAUER]: You're willing to pay twenty-five (25) dollars a week is that what you're saying?

[CHARLES]: Yes, I could afford to pay twenty-five (25) a week.

(Transcript pp. 58–60, 62).

Despite Carl's contentions, we find nothing in Charles' testimony that constitutes

the direct, clear, and convincing proof necessary to overcome the statutory presumption that Carl is the biological father of C.R.R. *See Minton*, 697 N.E.2d at 1260. Thus, in the same vein that our supreme court has held that a putative father cannot overcome the presumption by merely denying he had relations with his wife, we hold that Carl cannot overcome the statutory presumption of paternity by merely presenting testimony of his identical twin brother that the child is probably his and he is willing to pay child support. *See L.F.R.* 378 N.E.2d at 857. As a result, we hold that the trial court committed no error in determining that Carl is the biological father of C.R.R.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not err in determining that Carl failed to rebut the statutory presumption that he is the biological father of C.R.R.

Affirmed.

KIRSCH, C.J., and NAJAM, J., concur.